# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| **TRISTAN SCHULTIS, M.D.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 1:08CV00083 LMB** |
| | ) | |
| **ADVANCED HEALTHCARE** | ) | |
| **MANAGEMENT SERVICES, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This matter is before the court on the Amended Complaint of Plaintiff Tristan Schultis, M.D. ("Dr. Schultis"), alleging breach of contract claims against Defendant Advanced Healthcare Management Services, LLC ("AHCMS"). AHCMS has filed a counterclaim alleging breach of contract claims against Dr. Schultis. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c).

Several motions are presently pending before the court. Dr. Schultis has filed a "Motion to Strike Answer and Affirmative Defenses and to Dismiss Counterclaim Pursuant to Chambers v. NASCO, for Sanctions, and for Summary Judgment on the Main Demand." (Doc. No. 55). AHCMS has filed Defendant's Motion for Summary Judgment. (Doc. No. 49). AHCMS has also filed Defendant's Motion to File Exhibit Under Seal.[1] (Doc. No. 48).

---

[1] The court inadvertently failed to grant this motion at the time it was filed. The motion will will be granted at this time.

**Background**

In his original Complaint for Declaratory Judgment, Damages and other Equitable Relief filed on June 3, 2008, Dr. Schultis states that in a Physician Employment Agreement dated February 10, 2006 ("Agreement"), he agreed to perform services for the benefit of AHCMS in consideration of certain employee benefits set forth under the Agreement, as well as other valuable consideration.  (Doc. No. 1).  Dr. Schultis states that the Agreement contemplated two one-year terms, for the first of which he was to be remunerated at a fixed compensation of $300,000.00, and for the second of which he was to be remunerated at a fixed compensation of $275,000.00.  Dr. Schultis states that, as to both yearly terms, a "variable compensation" formula was established for his benefit.  Dr. Schultis states that the parties terminated his employment under the Agreement at the end of the two-year period and plaintiff was entitled to payment in accordance with the terms of the Agreement.

Dr. Schultis alleges that AHCMS underpaid him by a sum exceeding $150,000.00, in violation of the terms of the Agreement.  Dr. Schultis states that, as part of the benefits provided for in the Agreement, AHCMS was required to purchase professional liability insurance.  Dr. Schultis alleges that the conditions for the purchase by AHCMS of "tail coverage" were met and that AHCMS breached its Agreement by failing to provide tail coverage after the termination of the Agreement.  Dr. Schultis seeks a declaratory judgment and an order requiring AHCMS to furnish insurance coverage.

AHCMS filed a Counterclaim for Declaratory Judgment, Damages, and Other Equitable Relief, in which it states that Dr. Schultis failed to provide AHCMS notice that he intended to terminate his employment at least sixty days prior to the initial two-year term expiration, and that pursuant to the terms of the Agreement, it was automatically renewed.  (Doc. No. 5).  AHCMS

- 2 -

states that on April 2, 2008, AHCMS provided written notice to Dr. Schultis that his resignation would be accepted despite his failure to provide the required sixty days notice and that his decision to optionally terminate his employment would require that he provide tail end malpractice coverage pursuant to the Agreement.  AHCMS states that on April 10, 2008, Dr. Schultis advised AHCMS that he would provide the tail coverage and he signed an Authorization to Bind Coverage on that date.  AHCMS alleges that Dr. Schultis has failed to obtain tail coverage in violation of the Agreement.  AHCMS alleges that it has been damaged by Dr. Schultis' failure to provide tail coverage as it has been forced to continue Dr. Schultis' active coverage at $3,682.92 per month.  AHCMS requests a declaratory judgment that Dr. Schultis breached the Agreement by failing to provide tail coverage and an order requiring Dr. Schultis to furnish said coverage; and that Dr. Schultis be ordered to reimburse AHCMS for the monthly medical malpractice insurance premiums that they have paid on his behalf since Dr. Schultis left their employment.

On September 2, 2009, AHCMS filed an Amended Counterclaim, in which AHCMS asserts the additional allegation that AHCMS inadvertently overpaid Dr. Schultis income pursuant to the "variable compensation" formula in an amount to be determined by further audit of the billing records, but believed to exceed $25,000.00.  (Doc. No. 21).  AHCMS seeks judgment against Dr. Schultis for reimbursement of the income he was inadvertently overpaid.

On December 8, 2010, Dr. Schultis filed an Amended and Supplemental Complaint for Declaratory Judgment, Damages and Other Equitable Relief.  (Doc. No.  40).  Dr. Schultis restated the allegations of fact set forth in his original Complaint and stated as a separate cause of action the following alleged violations of the Agreement: (a) AHCMS' failure to pay Dr. Schultis timely and in the appropriate amounts due; (b) AHCMS' failure to pay wages timely and in the appropriate amounts; (c) AHCMS' breach of duty of good faith in connection with all aspects of

- 3 -

the relationship between Dr. Schultis and AHCMS; (d) AHCMS' wrongful infliction of emotional and other related non-pecuniary damages throughout the term of the relationship between Dr. Schultis and AHCMS, and its aftermath; (e) AHCMS' failure and/or refusal to negotiate in good faith regarding the disputes between the parties; and (f) any and all other violations of duty or by AHCMS to Dr. Schultis as may be shown at the trial of this matter.

<u>Discussion</u>

As previously stated, Dr. Schultis has filed a "Motion to Strike Answer and Affirmative Defenses and to Dismiss Counterclaim Pursuant to Chambers v. NASCO, for Sanctions, and for Summary Judgment on the Main Demand" ("Dr. Schultis' Motion"), along with a Statement of Uncontested Material Facts (Doc. No. 56). AHCMS has filed Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 53), along with a Response to Plaintiff's Statement of Uncontested Material Facts (Doc. No. 52), and a Memorandum in Opposition to Plaintiff's Motion to Strike Answer and Affirmative Defenses and Motion to Dismiss Amended Counterclaim (Doc. No. 54). AHCMS has also filed Defendant's Motion for Summary Judgment (Doc. No. 49), along with Defendant's Statement of Uncontested Material Facts (Doc. No. 51). Dr. Schultis filed a "Unified (i) Reply to Advanced Healthcare's Opposition to Plaintiff's Motion to Strike Answer and Affirmative Defenses and Motion to Dismiss Amended Counter-Claim and (ii) Opposition to Advanced Healthcare's Motion for Summary Judgment" (Doc. No. 58) ("Unified Reply"). Finally, AHCMS has filed Defendant's Reply in Support of Defendant's Motion for Summary Judgment. (Doc. No. 59).

## I.   <u>Dr. Schultis' Motion</u>

In his motion, Dr. Schultis first moves for an order pursuant to Chambers v. NASCO, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), striking the Answer and all affirmative defenses by AHCMS and dismissing AHCMS' counterclaim.  Plaintiff also requests that the court grant summary judgment in his favor on the main demand.  The court will discuss plaintiff's two motions separately.

**1.     Motion for Sanctions**

As previously stated, plaintiff requests that the court issue sanctions pursuant to Chambers v. NASCO, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), striking the Answer and all affirmative defenses by AHCMS and dismissing AHCMS's counterclaim.

In Chambers, the controlling authority on the imposition of sanctions pursuant to the inherent powers of the Court, the Supreme Court found that "a court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" 501 U.S. at 45-46, quoting Alyeska Pipeline Service Co. v. Wilderness Society, 421 U.S. 240, 259, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).  It is well-settled in the Eighth Circuit that a "district court is vested with discretion to impose sanctions upon a party under its inherent disciplinary power." See Bass v. General Motors Corp., 150 F.3d 842, 851 (8th Cir. 1998); Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 280 (8th Cir. 1995); Dillon v. Nissan Motor Co. Ltd., 986 F.2d 263, 267 (8th Cir. 1993).  "These powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Chambers, 501 U.S. at 43, quoting Link v. Wabash R.R. Co., 370 U.S. 626, 630-31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962).  "Because of the potency of inherent powers, '[a] court must exercise its inherent powers with restraint and discretion, and a primary aspect of that discretion is the ability to fashion an appropriate sanction.'" Plaintiffs' Baycol

Steering Comm. v. Bayer Corp., 419 F.3d 794, 802 (8th Cir. 2005), quoting Harlan v. Lewis, 982 F.2d 1255, 1262 (8th Cir. 1993), citing Chambers, 501 U.S. at 44-45.  "Over the years, the Supreme Court has found inherent power to include the ability to dismiss actions, assess attorneys' fees, and to impose monetary or other sanctions appropriate 'for conduct which abuses the judicial process.'"  Harlan, 982 F.2d at 1259, quoting Chambers, 501 U.S. at 43-45.

As a basis for Dr. Schultis' motion for sanctions, he claims that AHCMS filed into the record two fabricated documents and engaged in witness tampering.  The court will discuss these allegations separately.

**(i)     Fabrication of Documents**

Dr. Schultis first argues that AHCMS filed into the record of this case two fabricated versions of the original Agreement.  The first allegedly fabricated document was filed by AHCMS in support of its original Counterclaim.  (Doc. No. 5-3).  The second document was filed by AHCMS in support of its Amended Counterclaim.  (Doc. No. 17-2).  Dr. Schultis contends that both documents contained fabricated dates for the term of the contract and both documents contained an unauthorized stamped signature of Dr. Schultis.

AHCMS argues in its Memorandum in Opposition to Plaintiff's Motion to Strike Answer and Affirmative Defenses and Motion to Dismiss Amended Counterclaim that the documents at issue were not falsified.  AHCMS points out that this accusation was not brought to AHCMS' counsel's attention until the depositions held on March 14, 2011, almost three years after the first disputed document was filed.  AHCMS states that, when this issue was brought up, AHCMS' counsel advised Dr. Schultis and his counsel that she had not seen Document Number 5-3 after it was scanned and filed with the court, but that she had knowledge of other documents scanned and filed in federal court during that time that also contained scanning distortions.  AHCMS cites

numerous documents filed in this case and in other cases around the same time period, which contain manipulated and distorted text. AHCMS further argues that the issue of Document Number 5-3 is moot because AHCMS amended its counterclaim on July 15, 2009, so Document Number 5-3 is an abandoned pleading.

With regard to Document Number 17-2, AHCMS states that it is undisputed that there were four duplicate originals of the Agreement signed by the parties and each party was given two of the duplicate originals for their records.  AHCMS further states that its only copy included handwritten dates filled in on Paragraph 5(a) regarding the effective dates of employment as the Director for Human Resources for AHCMS, Steve Meyers, had filled in the dates to comply with an agreement between Dr. Schultis and AHCMS that his effective date of employment be set on or about February 10, 2006 so that his health, dental, vision, and life insurance could be in place around the time that he began seeing patients.  As to the difference in signatures, AHCMS again notes that the parties signed more than one Agreement.  Finally, AHCMS argues that the dates contained in Paragraph 5(a) of Document Number 17-2 do not affect the outcome in this matter.

In his Unified Reply, Dr. Schultis argues that AHCMS' explanation for the "admittedly fabricated" date on the Agreement is an issue of fact and credibility for the jury to decide.  Dr. Schultis contends that, if the court denies his motion for sanctions, a trial must take place to test the credibility of AHCMS' explanations regarding the contract and the issues surrounding Dr. Hoja.

The undersigned will deny Dr. Schultis' motion for sanctions with regard to the alleged fabrication of documents.  AHCMS has provided plausible explanations for the differences in the versions of the Agreement it submitted compared with the version of the Agreement Dr. Schultis submitted.  As Dr. Schultis acknowledges in his Unified Reply, the issue of different versions of

the Agreement submitted to the court by the parties is a question of fact and credibility for the jury to decide.

**(ii).** **Witness Tampering**

Dr. Schultis next argues that AHCMS engaged in witness tampering by threatening Dr. Michael Hoja that AHCMS would not release his rural certification number unless he gave testimony in this case which was "not detrimental" to AHCMS and that the return of his rural certification number depended on the outcome of this case. Dr. Schultis states that Dr. Hoja is a material witness in this case, as an original founder and owner of AHCMS who worked with Dr. Schultis on surgical procedures for over a year. Dr. Schultis states that Dr. Hoja was ousted by AHCMS in June 2009 under circumstances that made him particularly vulnerable to the whim of CEO Paula Harris. Dr. Schultis further states that Dr. Hoja needed to recover his Rural Certification Number from AHCMS so he could receive enhanced payments from Medicare for providing medical services in rural areas.

Dr. Schultis cites deposition testimony of Dr. Hoja, in which he stated that Ms. Harris told him that if his testimony was harmful to AHCMS then he would not receive his Rural Certification Number; whereas if his testimony was helpful, or at least not harmful to AHCMS, then he would receive his Rural Certification Number. Dr. Schultis claims that a telephone conversation between Ms. Harris and Dr. Hoja was heard by witness Shelly Gresham. Finally, Dr. Schultis cites the deposition testimony of Ms. Harris, during which she denied she made these statements, yet did not deny that AHCMS was holding the Rural Certification Number until this litigation was concluded.

AHCMS denies that Ms. Harris engaged in witness tampering and argues that Ms. Harris simply encouraged Dr. Hoja to tell the truth and to correct his previous false statements. AHCMS

states that on or about October 20, 2009, Dr. Hoja submitted a letter of support for Dr. Schultis in preparation for a mediation that was scheduled on October 28, 2009.  AHCMS further states that Dr. Hoja admitted in his deposition that the letter of support contains inaccuracies regarding the issues of this litigation.  AHCMS has cited numerous excerpts of Dr. Hoja's deposition testimony, which reveal Dr. Hoja admitted to factual inaccuracies or statements about which he was not confident regarding the accuracy.  For example, although Dr. Hoja stated in his letter of support that AHCMS agreed to pay Dr. Schultis full RVU value for surgical assists, Dr. Hoja admitted in his deposition that he was "not sure that that's accurate or not...so I may have misstated here." (Def's Ex. CC, p. 11).  AHCMS states that it denied Dr. Hoja's request that AHCMS give to him, for no consideration, one of their Rural Certification Numbers.  AHCMS states that in November and December of 2010, Dr. Hoja began discussing this issue with Ms. Harris.  AHCMS acknowledges that some of the specific statements between Dr. Hoja and Ms. Harris are in dispute, but argues that the uncontested facts prove by a preponderance of evidence that Ms. Harris did not do anything unlawful in speaking to Dr. Hoja and that she was only trying to encourage him to tell the truth and correct the inaccurate, damaging statements that he admitted to making in his letter of support for Dr. Schultis.

Witness tampering is a federal crime governed by 18 U.S.C. § 1512(b)(1).  Although Dr. Schultis need not demonstrate AHCMS' actions rose to the level of a federal felony, criminal standards provide some guidance.   18 U.S.C. § 1512(b)(1) provides as follows:

> [w]hoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to...influence, delay, or prevent the testimony of any person in an official proceeding...shall be fined under this tittle or imprisoned not more than 20 years, or both.

An affirmative defense to anyone charged with witness tampering under 18 U.S.C. § 1512(b)(1) is that the conduct "consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully." 18 U.S.C. § 1512(e).

Considering the evidence cited by both parties in this case regarding conversations between Dr. Hoja and Ms. Harris the court concludes that Dr. Schultis has not demonstrated that AHCMS engaged in witness tampering. Dr. Hoja admitted that his letter of support contained inaccuracies and that Ms. Harris told him to tell the truth. Also undisputed is the fact that AHCMS is the owner of the Rural Certification Number and Dr. Hoja has no ownership interests in the Rural Certification Number. Ms. Harris admitted in her deposition that AHCMS was not going to consider giving the Rural Certification Number to Dr. Hoja until this litigation was resolved due to Dr. Hoja's previous false statements. As AHCMS acknowledges, factual disputes exist regarding the conversations that took place between Dr. Hoja and Ms. Harris. These are issues of fact and credibility for a jury to determine. As such, Dr. Schultis' motion for sanctions will be denied.

## 2.     Dr. Schultis' Motion for Summary Judgment

Dr. Schultis next argues that, notwithstanding the alleged fabricated evidence and witness tampering, AHCMS is estopped from prevailing on any issue because it (i) never articulated any disagreement with Dr. Schultis' submission of data for purposes of quantifying his bonus, (ii) never reconciled the RVU accounts, (iii) never objected to Dr. Schultis providing mandated assistance to Dr. Hoja, and (iv) never put Dr. Schultis on notice that Paula Harris intended to slash his bonus points after the fact.

AHCMS argues in its Memorandum in Opposition to Plaintiff's Motion for Summary Judgment that Dr. Schultis' motion should be denied because there exists a dispute of genuine

issues of material fact as to most, if not all, of the facts supporting Dr. Schultis' Motion for

Summary Judgment.  AHCMS contends that Dr. Schultis did not plead estoppel or waiver as an

affirmative defense in his Answer to Defendant's Amended Counterclaim and has, therefore,

waived these defenses.  AHCMS further argues that AHCMS made no representations to Dr.

Schultis upon which he detrimentally relied and, therefore, his estoppel claim is meritless.  Finally,

AHCMS contends that AHCMS did not waive any rights which would preclude them from relief in

this action.

   In his Unified Reply, Dr. Schultis states that, if the court denies his motion for sanctions,

"the trial must then take place to test the credibility of Advanced Healthcare's explanations

regarding the contract and the issues surrounding Dr. Hoja."  (Doc. No. 58 at 9).  Dr. Schultis

continues, "the case must be tried to the jury, which will have to decide a multitude of credibility

issues."  (Id.).

   A court may grant summary judgment when no genuine issue of material fact exists and the

moving party is entitled to judgment as a matter of law, according to Federal Rule of Civil

Procedure 56 (c).  A fact is material only when its resolution affects the outcome of the case.  See

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202

(1986).  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a

verdict for either party.  See Anderson, 477 U.S. at 52.  In deciding a motion for summary

judgment, the court must review the facts and all reasonable inferences in a light most favorable to

the nonmoving party.  See Canada v. Union Elec. Co., 135 F.3d 1211, 1212 (8th Cir. 1997).

   In a motion for summary judgment, the movant bears the initial burden of proving the

absence of any genuine issue of material fact that would preclude judgment for the movant.  See

City of Mt. Pleasant, Iowa v. Associated Elec. Co-op, Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Once the movant has met this burden, the non-movant may not rely on mere denials or bare allegations, but must point to specific facts that raise a triable issue. See Anderson, 477 U.S. at 249. The non-movant must set forth specific facts, by affidavit or otherwise, sufficient to raise a genuine issue of material fact for trial. See Celotex Corp. v. Citrate, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The Supreme Court has found that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Id. at 327 (quoting Fed. R. Civ. P. 1).

In this case, Dr. Schultis has failed to demonstrate that no genuine issue of material fact exists or that he is entitled to judgment as a matter of law. In fact, as AHCMS points out, the documents submitted by the parties make clear that there are disputes of material facts regarding almost all of the facts in support of Dr. Schultis' motion. Dr. Schultis' Motion for Summary Judgment appears to be based in large part on his motion for sanctions. Dr. Schultis, in his Unified Reply, concedes that there are disputes of fact and that this matter should proceed to trial. Accordingly, Dr. Schultis' Motion for Summary Judgment will be denied.

## II.     AHCMS' Motion for Summary Judgment

AHCMS has filed a Motion for Summary Judgment, in which AHCMS requests summary judgment declaring that (1) AHCMS has overpaid Dr. Schultis under the variable compensation formula contained in the Agreement; and (2) that Dr. Schultis shall pay for his and AHCMS' medical malpractice insurance tail coverage for his employment while at AHCMS pursuant to the Agreement.

Dr. Schultis has not filed a formal Response to AHCMS' motion, nor has he filed a Response to AHCMS' Statement of Uncontested Material Facts. Instead, Dr. Schultis has filed his

Unified Reply, in which he opposes AHCMS' Motion for Summary Judgment but does not respond to AHCMS' Statement of Uncontested Material Facts.

AHCMS argues in its Reply that Dr. Schultis should be deemed by the court to have admitted all of the facts contained in AHCMS' Statement of Uncontested Material Facts pursuant to Local Rule 7-401, due to his failure to respond to AHCMS' Statement of Uncontested Material Facts. The undersigned acknowledges that Dr. Schultis' method of responding to AHCMS' Motion for Summary Judgment does not comply with Local Rule 7-401 and has complicated the court's task, but declines to deem the facts contained in AHCMS' Statement of Uncontested Material Facts admitted. See Brannon v. Luco Mop Co., 521 F.3d 843, 847 (8th Cir. 2008) (noting that district courts "retain[] considerable discretion" over enforcement of local rules). Dr. Schultis has responded to most of the facts alleged by AHCMS in his Unified Reply and the factual disputes are clearly before the court.

In contract actions governed by Missouri law, a dispute as to the meaning of contractual terms does not necessarily render summary judgment inappropriate, as the interpretation of a contract is a question of law. Wentzville Park Assocs., L.P. v. Am. Cas. Ins. Co. of Reading, Pa., 263 S.W.3d 736, 739 (Mo. Ct. App. 2008). In fact, summary judgment is a proper method for determining whether a contract or insurance policy is ambiguous and how an unambiguous policy should be interpreted. Atkins v. Hartford Cas. Ins. Co., 801 F.2d 346, 348 (8th Cir. 1986). Summary judgment is improper, however, "where the disputed contract language is ambiguous and parol evidence is required to interpret the contract and the parties' intent." Zeiser v. Tajkarimi, 184 S.W.3d 128, 132 (Mo. Ct. App. 2006). In such a case, the intent of the parties as to the meaning of the contract is a genuine issue of material fact that should be resolved at trial. Id. at 132-33.

- 13 -

Under Missouri law, a contract is interpreted with its plain and ordinary meaning, and will only be declared ambiguous if there is more than one reasonable interpretation of the contract. Cardinal Health 110 v. Cyrus Pharmaceutical, LLC, 560 F.3d 894, 900 (8th Cir. 2009) (citing Kelly v. State Farm Mut. Auto. Ins. Co., 218 S.W.3d 517, 522 (Mo. Ct. App. 2007)). If there is no ambiguity, external evidence cannot be used to interpret the contract. Id.

As noted above, AHCMS' Motion for Summary Judgment raises two main issues: (1) whether AHCMS has overpaid Dr. Schultis under the variable compensation formula contained in the Agreement; and (2) whether Dr. Schultis is required under the Agreement to pay tail coverage for his employment while at AHCMS. The undersigned will discuss these issues in turn.

## A.      Point I:  Variable Compensation Formula

In Point I of its Motion for Summary Judgment, AHCMS argues that it is entitled to partial summary judgment as this court should declare that Dr. Schultis should receive only twenty percent RVU value for all surgical assists pursuant to the terms of the Agreement and find that Dr. Schultis has been underpaid by no more than $1,878.60 under the terms of the Agreement. AHCMS further argues that Dr. Schultis should be barred from his requested relief under the doctrine of equitable estoppel as he performed the surgical assists with full knowledge that he would only receive a percentage of the RVU value.

Dr. Schultis argues in his Unified Reply that AHCMS' motion should be denied because the material issues involve the parties' state of mind and are in dispute. Dr. Schultis disputes that he performed surgical assists with knowledge that he would only receive a percentage of the RVU value. Dr. Schultis further argues that AHCMS never documented any disagreement with Dr. Schultis' submission of data for purposes of quantifying his bonus.

In its Reply, AHCMS again requests that the court declare that the Agreement clearly requires that Dr. Schltis receive only twenty percent RVU value for all surgical assists and that based upon Ms. Harris' revised calculation, he has been underpaid by $1,868.60; and that the court declare and order Dr. Schultis to provide the tail coverage under the clear and unambiguous terms of the Agreement.

The Agreement provides for a twenty-four-month term, which automatically renews for successive one-year periods under the terms effective at the time of renewal unless either party gives written notice to the other party of his or its intent not to renew at least sixty days prior to the end of any term.  (Pl's Ex. 1, ¶ 5(a)).  With regard to compensation, the Agreement provides that Dr. Schultis shall receive a fixed compensation of $300,000.00 during the first year of his term, and $275,000.00 during the second year of the term.  (Id. at¶ 4(a)).

The Agreement also provides Dr. Schultis the opportunity to earn variable compensation. The Agreement provides a formula for computation of Dr. Schultis' variable compensation.  It states as follows:

> Hospital shall calculate the Variable Compensation for which Physician shall be eligible by multiplying the sum of Physician's Work RVUs for a three (3) month period by the applicable Work RVU rate described on Exhibit A and reducing that calculation by the amount of Fixed Compensation that Hospital has paid to Physician during the three (3) month period.  At the end of each three (3) month period of the Term, Hospital shall compare Physician's Fixed Compensation paid for the period with Physician's Variable Compensation calculated for the period.  If the result exceeds Physician's Fixed Compensation, then Hospital shall pay such difference in compensation to Physician not later than the end of the month following the last month of the subject period.  This provision shall survive the termination or expiration of the agreement.

(Id. at ¶ 4(3)).  "Work RVU" is defined as follows:

> A "Work RVU" means the statistical physician work component established and maintained by the Centers for Medicare and Medicaid Services which, when combined with the overhead component and the malpractice component, creates the total relative value unit weight for a CPT code, the basis of physician payment in the Medicare system.

(<u>Id.</u> at ¶ 4(4)).

At issue in this case is the method by which Dr. Schultis' work RVUs were calculated in determining his variable compensation.  Specifically, AHCMS argues that Dr. Schultis was only entitled to receive a percentage of the RVUs for surgical assists that he provided to Dr. Hoja.  In October, 2006, Dr. Hoja was required by the State Board of Healing Arts to have a surgeon assist him in all open procedures and vaginal hysterectomies for a period of two years, in order to maintain his license to practice medicine.  (Def's Ex. CC).  Greg Carda, CEO of AHCMS at the time Dr. Hoja received his restriction from the State Board of Healing Arts, requested that Dr. Schultis provide the surgical assists whenever Dr. Schultis was available to do so.  (Def's Ex. KK)

AHCMS contends that because the Agreement clearly defines RVUs as "the statistical physician work component *established and maintained by the Centers for Medicare and Medicaid Services...the basis of physician payment in the Medicare system,*" work RVUs are based upon how the Centers for Medicare and Medicaid ("CMS") define RVUs.  AHCMS argues that Medicare and Medicaid both pay a maximum percentage for surgical assist RVUs, which is widely recognized in the medical community.  AHCMS, therefore, requests that the court find that the Work RVU definition clearly requires that Dr. Schultis' work RVUs must include all applicable modifiers for surgical assists, as required by Medicaid and Medicare.

The undersigned finds that the Agreement is ambiguous as to the amount Dr. Schultis should be paid for surgical assists.  The terms of the Agreement regarding Dr. Schultis' variable compensation are susceptible of more than one meaning such that reasonable persons can fairly differ in their construction of the terms of the Agreement.  The Agreement states that Dr. Schultis' variable compensation is based on the sum of "Physician's Work RVUs," which are defined as "*the*

*statistical physician work component* established and maintained by the Centers for Medicare and Medicaid Services." (Id. at ¶ 4(4)).  The Agreement does not define work RVUs as a percentage of the statistical physician work component established by CMS, nor does it set forth exceptions for specific procedures, such as surgical assists.  As such, one could reasonably interpret the Agreement as requiring that Dr. Schultis receive the full RVU rate for surgical assists.  Likewise, the Agreement could reasonably be interpreted as AHCMS suggests, to incorporate the Medicare and Medicaid reimbursement rates of sixteen percent and twenty percent respectively for surgical assists.

Due to the ambiguity in the Agreement regarding the calculation of work RVUs and because parol evidence is required to determine the parties' intent, a genuine issue of material fact exists and, therefore, summary judgment is not proper.

AHCMS further argues that the court should find, based upon the undisputed material facts, that Dr. Schultis had full knowledge that he would only receive a percentage of the RVU work value for surgical assists and that he is, therefore, estopped from any relief under the doctrine of equitable estoppel.

The doctrine of equitable estoppel is an affirmative defense.  Ryan v. Ford, 16 S.W.3d 644, 651 (Mo. Ct. App. 2000).  Equitable estoppel arises from the unfairness of allowing a party to belatedly assert rights if he knew of those rights but took no steps to enforce them until the other party has, in good faith, been disadvantaged by changed conditions.  Investors Title Co. v. Chicago Title Ins. Co., 983 S.W.2d 533, 537 (Mo. Ct. App. 1998).  Whether the doctrine applies depends upon the facts and circumstances of each particular case.  Peerless Supply Co. v. Indust. Plumbing & Heating Co., 460 S.W.2d 651, 666 (Mo. 1970).  Nevertheless, equitable estoppel is not favored in the law and it will not be invoked lightly.  Investors Title, 983 S.W.2d at 537.

""[E]quitable estoppel requires more than proof of acceptance of benefits." <u>Ryan</u>, 16 S.W.3d at 651.  In order for a party to prevail on a theory of equitable estoppel, he must prove every fact essential to create an estoppel by clear and satisfactory evidence. <u>Investors Title</u>, 983 S.W.2d at 537.  Specifically, "there must be a representation made by the party estopped and relied upon by another party who changes his position to his detriment." <u>Id.</u>  In other words, the representation made by the party estopped must be inconsistent with the claim afterwards asserted and sued upon, and another party must have relied upon the representation and been injured thereby. <u>Ryan</u>, 16 S.W.3d at 651.

AHCMS argues that it has provided the following evidence in support of its argument that Dr. Schultis knew he would only receive a percentage of the work RVU for surgical assists: an affidavit of CEO Michael Raymond, stating that he at all times advised Dr. Schultis that he would not be allowed the full RVU rate for any assists that he did for Dr. Hoja (Def's Ex. KK); the affidavit of interim CEO Christy Hardin, who states that none of the physicians working at AHCMS received the full RVU rate for performing surgical assists (Def's Ex. LL); the deposition of Dr. Schultis, in which he agreed that at the time Greg Carda requested that he provide surgical assists to Dr. Hoja, there would be no change in the Agreement as to the Variable Compensation formula (Def's Ex. BB, p. 77); the deposition testimony of Dr. Schultis in which he agreed that the Agreement requires that all modifications be in writing and signed by the parties and that no writing exists that states he can receive full RVU value for surgical assists (Def's Ex. BB, p.78, 81-82); and the deposition testimony of Dr. Schultis' witness, Amber Dill Anderson, in which she stated that Dr. Schultis told her that he would receive a percentage for surgical assists (Def's Ex. GG, p. 17, 14).

Dr. Schultis argues that he was entitled to receive full RVU value for surgical assists pursuant to the Agreement and that Ms. Harris attempted to reduce his RVU rate in violation of the Agreement.  The deposition testimony of Dr. Schultis cited by AHCMS supports Dr. Schultis' argument that he believed the Agreement provided for the full RVU rate for surgical assists:

> [AHCMS' Counsel]: You do not have anything in writing that would state that Mike Raymond modified the agreement that you had with Advanced Healthcare?
>
> [Dr. Schultis]: No.
>
> [AHCMS' Counsel]: And there exists no such writing?
>
> [Dr. Schultis]: Correct.
>
> ***
>
> [AHCMS' Counsel]: The rest of the agreement was in place, stayed in place?
>
> [Dr. Schultis]: Yes.
>
> ***
>
> [AHCMS' Counsel]: If you did not designate on the SuperBill that it wasn't medically necessary for you to provide that assist how would the next person down the line know whether or not they could bill that to Medicare or Medicaid?
>
> [Dr. Schultis]: That was not my problem.  The contract was set up to avoid that.

(Def's Ex. BB at 82-83, 85).

Dr. Schultis contends that AHCMS never documented any disagreement with his submission of data for purposes of quantifying his bonus and never reconciled his RVU accounts until after the fact.  Dr. Schultis cites the following evidence in support of his argument: the deposition of Ms. Harris, in which she states that she did not begin calculating Dr. Schultis' RVUs until after Dr. Schultis left in 2008 (Pl's Ex. 17, p. 36-37); deposition testimony of Angela Treat, in which she states that Dr. Schultis was frustrated over the refusal by AHCMS to provide reports and to reconcile the RVUs (Pl's Ex. 16, p. 10); and testimony of Ms. Harris during which she

stated that AHCMS made calculations regarding Dr. Schultis' RVUs but never shared the information with Dr. Schultis and had not produced the evidence in this litigation at the time of her deposition (Pl's Ex. 17, p. 35-36).

AHCMS has failed to demonstrate any of the required elements of equitable estoppel. Although AHCMS contends that the undisputed material facts reveal that Dr. Schultis had full knowledge that he would only receive a percentage of the RVU work value for surgical assists, the facts surrounding this issue are highly disputed. Dr. Schultis has presented evidence supporting his position that he believed he was entitled to full RVU work value for surgical assists. It is undisputed that, during his employment with AHCMS, Dr. Schultis frequently questioned the accuracy of AHCMS' calculations of his RVUs and that he became frustrated with AHCMS due to his belief that AHCMS refused to reconcile the RVUs.

Accordingly, AHCMS' Motion for Summary Judgment will be denied as to Point I.

**B.     Point II: Tail Coverage**

In Point II of its Motion for Summary Judgment, AHCMS argues that because Dr. Schultis terminated his employment pursuant to Section 5(b)(4) of the Agreement, he is expressly required to provide the medical malpractice insurance tail coverage pursuant to Section 3(b) of the Agreement. Dr. Schultis does not respond to this claim in his Unified Reply.

Section 3(b) of the Agreement provides, in relevant part:

> Hospital shall not provide such tail coverage if (i) Hospital terminates this Agreement pursuant to the provisions of Section 5(b)(2) or 5(b)(3); (ii) *Physician terminates this Agreement pursuant to Section 5(b)(4)*; or (iii) the Agreement automatically terminates pursuant to Section 5(b)(5) due to Physician's loss of his medical license in Missouri...

(Id. at ¶ 3(b)) (emphasis added).

Section 5(b)(4) states:

> **Optional Termination.**  Either Hospital or Physician may terminate Physician's employment, with or without cause, at any time by giving notice to the other party at least sixty (60) days' prior to termination.

(<u>Id.</u> at ¶ 5(4)) (emphasis in original).

The Agreement, therefore, clearly and unambiguously provides that Dr. Schultis must provide tail coverage in the event that he optionally terminates his employment.

Dr. Schultis testified as follows in his deposition:

> [AHCMS' Counsel]: Look at No. 4.  No. 4 is optional termination.  Either hospital or physician may terminate physician's employment with or without cause at any time by giving notice to the other party unless sixty days prior to termination.
> Isn't that how you terminated?
>
> [Dr. Schultis]: That works.
>
> [AHCMS' Counsel]: Okay.
>
> [Dr. Schultis]: That's exactly how I terminated.

(Def's Ex. BB, p. 114).

The undisputed facts reveal that Dr. Schultis optionally terminated his employment pursuant to Section 5(b)(4) of the Agreement.  As such, Dr. Schultis is expressly required to provide tail coverage pursuant to Section 3(b) of the Agreement.

Thus, AHCMS' Motion for Summary Judgment will be granted as to Point II.

Accordingly,

**IT IS HEREBY ORDERED** that Dr. Schultis' "Motion to Strike Answer and Affirmative Defenses and to Dismiss Counterclaim Pursuant to Chambers v. NASCO, for Sanctions, and for Summary Judgment on the Main Demand" (Doc. No. 55) be and it is **denied**.

**IT IS FURTHER ORDERED** that Defendant's Motion to File Exhibit Under Seal (Doc. No. 48) be and it is **granted**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment be and it is **granted in part and denied in part**.  The motion is denied as to Point I and is granted as to Point II.  A separate Partial Summary Judgment will be entered on this date.


Dated this   8th    day of August, 2011.


_Lewis M. Blanton_____
LEWIS. M. BLANTON
UNITED STATES MAGISTRATE JUDGE